# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| TONY MORROW, | ) | |
| | ) | |
| Plaintiff, | ) | No. |
| | ) | |
| v. | ) | **Complaint and Jury Demand** |
| | ) | |
| TYSON FRESH MEATS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PRELIMINARY STATEMENT

1.  This is an action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Iowa Civil Rights Act, Iowa Code § 216.6 *et seq.* ("ICRA"), and the Americans with Disabilities Act, As Amended, 42 U.S.C. § 12101, *et seq.* ("ADAAA").

2.  Defendant Tyson Fresh Meats, Inc. ("Defendant" or "Tyson") subjected Plaintiff, Ms. Tony Morrow ("Plaintiff" or "Ms. Morrow"), a meat factory employee, to a hostile work environment, including threats to her health and safety, because of her sex and/or gender, including sex stereotyping, gender expression, gender-related identity, and/or actual or perceived sexual orientation.

3.  Plaintiff was also subjected to retaliation because of her complaints to Defendant regarding the discrimination, harassment and the hostile work environment because of her sex and/or gender.

4.  Eventually, when Defendant rendered Ms. Morrow's working conditions intolerable and unsafe for her and for any reasonable transgender woman, it constructively discharged her.

**PARTIES**

5.   Plaintiff is domiciled in the State of Iowa and resides in Waterloo, Iowa. She worked for Defendant at its Waterloo, Iowa pork facility from August 2012 to August 2019. Ms. Morrow is a transgender female who began living as a woman in 2018.

6.   Defendant is a public company incorporated under the laws of Delaware and is headquartered in Springdale, Arizona. Defendant employs thousands of employees.

7.   Plaintiff resides in the village of Mohawk, Herkimer County, State of New York.

**PROCEDURAL HISTORY**

8.   Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC" or "Commission") alleging violations of Title VII by Defendant, including discrimination based on sex, retaliation, hostile work environment, and constructive discharge, which was cross-filed with the Iowa Civil Rights Commission.   A copy of Plaintiff's EEOC Charge is attached hereto as Exhibit A and its contents are incorporated as if fully set forth herein.

9.   On February 21, 2020, the Iowa Civil Rights Commission issued Plaintiff a "right to sue." A copy is attached hereto as Exhibit B.

10. Upon information and belief, the EEOC and the Iowa Civil Rights Commission provided Defendant with notice of the charges of discrimination.

11. Upon information and belief, the EEOC and/or the Iowa Civil Rights Commission investigated the charges of discrimination.

12. Plaintiff requested a Notice of Right to Sue from the EEOC notifying her of her right to bring suit, and she has filed suit before 90 days of receipt of the notice.

13. Plaintiff took all necessary steps to fulfill all conditions precedent to the commencement of this lawsuit.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the action is based on Title VII of the Civil Rights Act.

15. Alternatively, the Court has jurisdiction over the claims in this action pursuant to 28 U.S.C. §1331 as the parties are citizens of different states and the amount in controversy exceeds $75,000.

16. Venue is proper in the United States District Court for the Northern District of Iowa pursuant to 42 U.S.C. § 2000e-5(f)(3) because a substantial part of the unlawful employment practices, decisions relating thereto, and their effects are alleged to have been committed within the jurisdiction of the Northern District of Iowa.

17. Venue is also proper before this Court pursuant to 28 U.S.C. §1391(b)(2), as a substantial part of the events giving rise to the claim occurred in this District.

18. This Court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. §1367 because the state law claims have a common nucleus of operative fact and form part of the same case or controversy as the federal claims.

## FACTS COMMON TO ALL COUNTS

19. Ms. Morrow has a female gender identity.

20. Ms. Morrow has a feminine gender expression.

21. Ms. Morrow is a woman who is transgender.

**Sex, Gender, Gender Expression, and Gender Identity**

22. *Sex* is a term that includes sex stereotyping, gender, gender expression, and/or gender-related identity within its meaning.

3

23. *Sex stereotyping* refers to the application by an employer of stereotypes related to sex to restrict, disparage, or discriminate on the basis of an employee's gender expression or identity.

24. *Gender* refers to cultural expectations specific to the sexes.

25. *Gender expression* refers to a person's gender-related appearance and behavior, whether or not stereotypically associated with the person's sex assigned at birth.

26. *Gender identity* refers to a person's internal sense of sex, being male, female, or other.

27. Gender identity is intractably rooted at a very early age and cannot be changed.

28. *Transgender individuals* are people who have a gender-related identity that does not match the sex they were assigned at birth.

29. *Gender transition*. Transgender individuals often seek out legal, social, and medical means of aligning external manifestations of their sex and gender with their gender identity. This process is colloquially known as gender transition or transition.

30. Discrimination against transgender people for being transgender is discrimination based on their sex and/or gender, including sex stereotyping, gender expression, and gender-related identity.

31. It is appropriate to refer to a transgender woman who has transitioned with female titles, honorifics (e.g., Miss, Ms., or Mrs.), and pronouns (e.g., her, hers, and she).

**Plaintiff's Employment at Tyson**

32. In August 2012, Ms. Morrow was hired by Tyson to work at its Waterloo, Iowa, facility ("Plant") on the Head Inspect Floor inspecting the hogs as they came into the factory.

33. In 2013, due to her excellent performance, Ms. Morrow was promoted to become a Hog Driver in the stick pen, where she helped administer the processes of moving hogs into the machines.

4

34. In or around 2014, the Plant started operating new $CO_2$ machines to gas the hogs, and Ms. Morrow developed a specialty in operating the machines and was taken off the line in the stick pen to train incoming employees and senior management to use the machines.

35. Because Ms. Morrow became highly proficient in operating the machines and training others to do so, she started traveling to other plants across the Midwest, including other parts of Iowa as well as Nebraska, Arkansas, and South Dakota, to train other employees and senior management. While her responsibilities changed, her job title ("Hog Driver") remained the same.

36. As a Hog Driver, Ms. Morrow reported directly to a line supervisor. She also reported to (in the order of increasing seniority): a general supervisor, operations manager, plant manager, and then the general manager.

**Tyson Subjected Ms. Morrow to Hostile Work Environment**

37. Throughout Ms. Morrow's employment at Tyson, her managers and supervisors bombarded her with insults related to her sex and/or gender, calling her a "faggot" as a means of disparaging her gender, and making other discriminatory comments. They invaded her privacy with questions about her lifestyle and sexuality, sexually harassed her by grabbing her body parts, hovered around her, and physically threatened her, making her feel physically unsafe and stripping her of her dignity.

38. The harassment significantly escalated beginning in 2018, when Ms. Morrow began physically transitioning from male to female.

39. Since then, Ms. Morrow's supervisors made the following gender-based harassing comments to her[1]:

a. the Plant's Manager, Tom Hart, asked Ms. Morrow at work if "you and your meteorologist boyfriend are still fucking" after learning she was dating a male meteorologist;

b. the Plant's Operations Manager, Hamdija Beganovic, frequently referred to Ms. Morrow as a "faggot" or a "girl" and told her that he did not like "homosexual"[2] or transgender people and felt that "they don't have a place in this world;"

c. Mr. Beganovic regularly made derogatory comments about Ms. Morrow's appearance, including her weight, hair and nails, such as, "Ladies' hair is normally not a mess like that, but at the end of the day, you're not a real woman;"

d. the Plant's Night Manager, Don Mershbrock, grabbed one of Ms. Morrow's breasts and told her: "your fat is not natural," "you're getting too fat to be gay," and "if you keep eating like that, you won't even have fun in your favorite gay position;"

e. the Building Maintenance Supervisor, Steve Adams, asked Ms. Morrow if someone "stuffed a penis in [her] mouth – is that why your mouth is crooked like that?"

f. the Kill Floor Supervisor, Colby Timmer (who was Ms. Morrow's immediate supervisor), loudly told another supervisor in front of Ms. Morrow that her clothes were "too tight" and that they did not think "he has a dick." They further speculated whether Ms. Morrow's genitalia was "being cut off."

[1] This is a non-exhaustive list demonstrating only some of the discriminatory treatment Plaintiff endured on a daily basis.
[2] Though Ms. Morrow is a heterosexual female and her supervisors at Tyson were aware of this, they used the term "homosexual" as a way of referencing Ms. Morrow's gender non-conformity rather than her sexual orientation.

6

g.  in or around late October 2018, Mr. Timmer harassed Ms. Morrow for wearing leggings at work – despite having no dress code policy with respect to employees' pants – and asked Ms. Morrow if her mother was okay with her wearing such tight clothes and whether she knew that Ms. Morrow was "homosexual" and approved of her lifestyle.

h.  Tyson required Ms. Morrow to use a male locker room despite her expressing a preference to use a female locker room. In the male locker room, many of Ms. Morrow's male coworkers have tormented her by sitting and watching her get undressed. When Ms. Morrow requested an accommodation to begin changing in the female locker room, Tyson denied on multiple occasions, claiming that, until Ms. Morrow had "full female genitalia," nothing can be done.

40. These comments were made with the intent to disparage Ms. Morrow's sex and/or gender.

41. Tyson's hostile work environment and harassment of Ms. Morrow was far-reaching and followed Ms. Morrow to other plants that she visited to train employees.

42. For example, while at a plant in Nebraska in or around September 2018, an employee told his supervisor that he did not feel comfortable being trained by a transgender person. In response, the supervisor asked Ms. Morrow to go over to the other side of the room and train someone else because she was making that employee "uncomfortable."

43. Similarly, when Ms. Morrow visited a plant in Perry, Iowa, a superintendent informed her that, "his team does not get trained by a faggot."

44. The hostile work environment at Tyson was so severe that it created a culture in which even USDA inspectors who regularly visit the Plant to inspect its meat production, encouraged

7

by the hostile work environment perpetuated, ratified and condoned by Defendant, would harass Ms. Morrow based on her sex and/or gender.

45. For example, one USDA employee, among other things, routinely called Ms. Morrow a "faggot," slammed the door in her face, and, on one occasion, spit on her car.

46. In January 2019, the same USDA employee physically threatened Ms. Morrow during one of his routine inspections, stating that, "eradication is the only way with your type of people."

47. Ms. Morrow alerted Tyson of the inspector's behavior, but no investigation was conducted, and Defendant allowed him to continue inspecting the Plant.

48. Tyson did not take prompt and effective action to stop the hostile work environment caused by this behavior.

49. In a shocking display of egregious behavior, this USDA employee and other USDA employees also threw raw meat at Ms. Morrow, despite her repeatedly telling them to stop.

**Tyson's Retaliation Against Ms. Morrow Because of Her Complaints of Discrimination**

50. Over the years, in response to the hostile work environment Ms. Morrow was subjected to at Tyson, she made numerous internal complaints, primarily to the Head of Personnel, Jim Hook, and Tyson's Ethics "Help Hotline."

51. However, Tyson did not take any action to address or prevent the harassment.

52. In response to most Ms. Morrow's complaints to Mr. Hook, he would typically tell her that he was "too busy to deal with these issues," and on one occasion even went so far as to ask Ms. Morrow to leave his office, claiming that he could not deal with it and requesting that Ms. Morrow close his office door behind her.

8

53. Even to the most inflammatory and disturbing comments, Mr. Hook responded that he had a business to run and that they were "all adults" and he was not a babysitter.

54. Of the few times Mr. Hook had acknowledged that the discriminatory treatment of Ms. Morrow was egregious and told her that he would look into it, neither he nor anyone else at Tyson took any meaningful action to investigate these incidents or remedy the situation.

55. Instead, Tyson retaliated against Ms. Morrow for making the protected complaints. On January 16, 2019, Ms. Morrow learned that the Mr. Timmer, Kill Floor Supervisor and Ms. Morrow's immediate supervisor, who previously worked on a different floor, was returning to the stick pen on the same shift as Ms. Morrow.

56. Due to the severely hostile work environment he had created for Ms. Morrow, she did not feel safe working alongside him and thus asked the Kill Floor's General Manager, Kasey Staley, not to be assigned to work with him.

57. On both January 31 and February 1, 2019, Ms. Morrow met separately with various supervisors to explain that Mr. Timmer did not like transgender people and that Ms. Morrow did not want to work with him.

58. Tyson did not take any action to accommodate Ms. Morrow's request, and instead forced her to work the same shift as Mr. Timmer.

59. Tyson also demoted Ms. Morrow because of her complaints of discrimination. Just one day after she made the complaints to several of her supervisors about Mr. Timmer's discriminatory conduct toward her, the Plant's Operations Manager communicated that Tyson would be eliminating her position with respect to operating and managing the $CO_2$ machines and training employees, and would be demoting Ms. Morrow back to the line where her only material responsibility would be to drive the hogs up to the $CO_2$ machines.

9

60. Ms. Morrow's salary and wages significantly decreased in retaliation for her complaints.

61.  Beginning on or about February 2, 2019, one day after she complained to several managers about discrimination, Defendant reduced her hours from 12-hour shifts with overtime pay to 8-hour shifts with no overtime pay.

62. At the same time, her material responsibilities were significantly diminished, and she was removed from doing management-level work to lower-level line work.

63. Ms. Morrow's supervisors repeatedly told her to quit her job and tried to push her out of the Company on a daily basis.

64. For instance, on April 29, 2019, the Kill Floor Superintendent, Jerome Rinken, told Ms. Morrow that she "may as well just quit." When Ms. Morrow arrived at work on the morning of May 29, 2019, Mr. Rinken again told her that she may as well go back home because, according to him, all she did was complain about her supervisors and everyone else.

65. On June 19, 2019. Mr. Rinken told Ms. Morrow that she should "just stay out of Tyson and look for a new job."

66.The hostile environment unreasonably interfered with Ms. Morrow's ability to perform her job duties, by disrupting her relationship to her employers and management, by the unreasonable criticism and scrutiny of her sex and/or gender which flowed directly from Defendant's failure to take prompt and effective action to stop the hostile work environment, by Ms. Morrow's need to spend many hours on otherwise unnecessary grievance processes and other means of seeking relief, and her daily reasonable fear of her environment, amongst other reasons, and created daily working conditions intolerable to a reasonable transgender woman.

**Impact of the Hostile Work Environment on Ms. Morrow's Health**

67. The totality of the harassment Ms. Morrow experienced at Tyson resulted in severe trauma and emotional distress, causing her to develop extreme depression, anxiety, panic attacks, sleeplessness, fatigue, nausea, and skyrocketing blood pressure.

68. In February 2019, this constant trauma culminated in a severe mental and physical breakdown, and Ms. Morrow checked herself into a psychiatric hospital, where stayed for several days.

69. Ms. Morrow took a short-term disability leave while she was at the hospital and then at home recovering.

70. Tyson's response to Ms. Morrow's taking the medical leave was retaliatory.

71. For example, when she returned to work on February 21, 2019, the Plant's Operations Manager, Ms. Beganovic, exclaimed, "You decided to bring your fucking ass back to work!"

72. Due to Ms. Morrow's medical conditions, she took intermittent FMLA leave.

73. On March 20, 2019, Ms. Morrow's supervisors ridiculed and accused her of taking FMLA and short-term disability leave in response to their changing of her position, and not because she was actually unwell.

**Tyson Constructively Terminated Ms. Morrow's Employment**

74. Tyson's conduct described above, including its failure and refusal to take prompt and effective action to remedy the ongoing egregious harassment and Ms. Morrow's supervisors' overt pressure to quit, made it impossible for Ms. Morrow to perform her work duties there without a serious risk to her health and safety.

75. The situation became even worse when, on or around July 10, 2019, Ms. Morrow found two threatening notes in her work locker which stated, among other things: "Get Out," "We

don't like your kind," "Watch your back," and "If I lose my job because of your dirty cunt ass, you better hope I never see you outside of Tyson."

76. Ms. Morrow immediately reported these notes to Personnel Department on the same day.

77. The Personnel Department stated that it would investigate the incident.

78. Nonetheless, Defendant did not take prompt and effective action to stop the harassment and to ensure Ms. Morrow's safety at work.

79. After Ms. Morrow found the notes, fearing for her safety, she took an unpaid leave of absence until August 28, 2019.

80. She hoped that Tyson would work with her to find an accommodation that would alleviate her health and safety concerns.

81. Tyson, however, proposed no reasonable solution and rejected her proposal of moving her into a remote position.

82. The Company claimed that it had no evidence of any harassment of Ms. Morrow.

83. Because Tyson deliberately rendered the working conditions at the Plant intolerable in order to force Ms. Morrow to resign, and because it was unhealthy and unsafe for Ms. Morrow to keep reporting to the Plant, she had no other choice but to end her employment with Tyson.

84. On or around August 27, 2019, she notified Tyson that the hostile work environment at the plant and their failure and refusal to take prompt and effective action to halt the harassment were more than she or any reasonable person could tolerate, and, as a result, her employment was constructively discharged.

## CAUSES OF ACTION

### COUNT 1
### 42 U.S.C. § 2000e *et seq*.
### Hostile Work Environment Because of Sex and/or Gender

85. Plaintiff re-alleges all previous paragraphs as if fully set forth herein.

86. Ms. Morrow is a member of a protected category with regard to sex.

87. Ms. Morrow was targeted for harassment and subjected to a hostile work environment because of her sex and/or gender.

88. Ms. Morrow's supervisors made derogatory comments about her sex and/or gender, such as referring to her perceived sexuality as homosexual using gender-based epithets such as "faggot."

89. These comments were unwelcome to Ms. Morrow, and offended her.

90. Any reasonable transgender woman would have been offended by these comments. These comments created an atmosphere of discriminatory intimidation, ridicule, and insult that permeated the work environment because of their occurrence daily or weekly after Ms. Morrow's gender transition.

91. These references, occurring daily or weekly after her gender transition, were sufficiently severe or pervasive so as to alter the conditions of Ms. Morrow's employment and to create an abusive working environment.

92. The hostile work environment unreasonably interfered with Ms. Morrow's ability to perform her job duties, because, *inter alia*, she was unsafe at the workplace and Tyson's employees refused to receive instruction and direction from her.

93. Defendant, despite being on notice of the acts, failed to take prompt and effective action to stop the hostile work environment.

94. Ms. Morrow perceived the working environment to be abusive or hostile.

95. A reasonable woman in Ms. Morrow's circumstances would consider the working environment to be abusive or hostile.

96. Defendant's actions occurred because of Ms. Morrow's sex and/or gender.

97. She would not have been the object of harassment but for her sex and/or gender, and/or her harassment was motivated by her sex and/or gender.

98. Defendant was on notice of the hostile work environment, including actual notice by means of complaints made by Ms. Morrow as detailed herein and vicariously and constructively by means of the acts perpetrated by Ms. Morrow's supervisors, as detailed herein.

99. As a direct and proximate result of Defendant's unlawful discrimination, Ms. Morrow incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to her professional reputation, and other pecuniary and non-pecuniary losses which damages would not have occurred but for Defendant's unlawful hostile work environment.

100. By engaging in the conduct described above, Defendant discriminated against Ms. Morrow intentionally, knowingly or recklessly with regard to Ms. Morrow's federally protected rights, for which Plaintiff seeks punitive damages.


**COUNT 2**
**42 U.S.C. § 2000e *et seq*.**
**Constructive Termination Because of Sex and/or Gender**

101. Plaintiff realleges all previous paragraphs as if full set forth herein.

102. The hostile work environment created, perpetuated, ratified and condoned by Defendant towards Ms. Morrow actions occurred because of Ms. Morrow's sex and/or gender.

103.  She would not have been the object of harassment but for her sex and/or gender, and/or her harassment was motivated by her sex and/or gender.

104.  The hostile work environment created, perpetuated, ratified and condoned by Defendant towards Ms. Morrow created conditions so intolerable to any reasonable transgender woman that she was constructively discharged.

105.  Defendant constructively discharged Ms. Morrow because of sex and/or gender.

106.  As a direct and proximate result of Defendant's unlawful termination, Ms. Morrow has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to professional reputation, and other pecuniary and non-pecuniary losses.

107.  By engaging in the conduct described above, Defendant intentionally, knowingly or recklessly with regard to Ms. Morrow's federally protected rights constructively discharged Ms. Morrow, for which Plaintiff seeks punitive damages.


## COUNT 3
### 42 U.S.C. § 2000e *et seq*.
### Retaliatory Hostile Work Environment

108.  Plaintiff re-alleges all previous paragraphs as if fully set forth herein.

109.  Ms. Morrow was targeted for harassment and subjected to a hostile work environment because of her exercise of protected rights known to Defendant.

110.  Ms. Morrow's supervisors referred to her as a homosexual and made other statements, such as "faggot," referring to Ms. Morrow's gender that offended her on the basis of sex and/or gender..

111.  These references were unwelcome to Ms. Morrow.

These references created an atmosphere of discriminatory intimidation, ridicule, and insult that permeated the work environment because of their occurrence daily or weekly after Ms. Morrow's gender transition.

112. These references, occurring daily or weekly after her gender transition, were sufficiently severe or pervasive so as to alter the conditions of Ms. Morrow's employment and to create an abusive working environment.

113. The hostile work environment unreasonably interfered with Ms. Morrow's ability to perform her job duties, because, *inter alia*, she was unsafe at the workplace and Tyson's employees refused to receive instruction and direction from her.

114. Defendant, despite being on notice of the acts, failed to take prompt and effective action to stop the hostile work environment.

115. Ms. Morrow perceived the working environment to be abusive or hostile.

116. A reasonable woman in Ms. Morrow's circumstances would consider the working environment to be abusive or hostile.

117. Defendant's actions occurred because of Ms. Morrow's sex and/or gender..

118. She would not have been the object of harassment but for her sex and/or gender, and/or her harassment was motivated by her sex and/or gender.

119. Defendant was on notice of the hostile work environment, including actual notice by means of complaints made by Ms. Morrow as detailed herein and vicariously and constructively by means of the acts perpetrated by Ms. Morrow's supervisors, as detailed herein.

120. As a direct and proximate result of Defendant's unlawful discrimination, Ms. Morrow incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to her professional reputation, and other pecuniary and non-pecuniary losses which damages would not have occurred but for Defendant's unlawful hostile work environment.

121. By engaging in the conduct described above, Defendant discriminated against Ms. Morrow intentionally, knowingly or recklessly with regard to Ms. Morrow's federally protected rights, for which Plaintiff seeks punitive damages

**COUNT 4**
**42 U.S.C. § 2000e *et seq*.**
**Retaliation**

122. Plaintiff realleges all previous paragraphs as fully set forth herein.

123. The effect of Defendant's acts complained of above was to deprive Ms. Morrow of equal employment opportunities as an employee because of retaliation for her complaints of discrimination in violation of Title VII.

124. By complaining to Defendant about the discriminatory practices and hostile work environment described herein and opposing said practices and hostile work environment directed at herself, Ms. Morrow engaged in activities protected by Title VII.

125. Ms. Morrow's exercise of protected rights was known to Defendant because the complaints were made to Defendant during her employment.

126. The action taken against Ms. Morrow up to and including her termination would dissuade a reasonable employee from making or supporting a complaint of discrimination.

127. By complaining to Defendant about her reasonable and good faith belief in the occurrence of discriminatory practices and hostile work environment described herein, and opposing said

practices and hostile work environment directed at herself, Ms. Morrow engaged in activities protected by Title VII, whether or not such discriminatory practices and hostile work environment are ultimately found to have occurred.

128. As a direct and proximate result of Defendant's unlawful retaliation, Ms. Morrow has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to professional reputation, and other pecuniary and non-pecuniary losses.

129. By engaging in the conduct described above, Defendant retaliated against Ms. Morrow intentionally, knowingly or recklessly with regard to Ms. Morrow's federally protected rights, for which Plaintiff seeks punitive damages.

## COUNT 5
## AMERICANS WITH DISABILITIES ACT, AS AMENDED
## 42 U.S.C. § 12101, et seq.
### Hostile Work Environment Because of Disability

130. Plaintiff realleges all previous paragraphs as if fully set forth herein.

131. Defendant's managers and employees working with Ms. Morrow believed that she is a person with disabilities, including but not limited to gender dysphoria.

132. With or without reasonable accommodations, Ms. Morrow was qualified to perform her job duties and performed them well.

133. Ms. Morrow was targeted for harassment and subjected to a hostile work environment because of her perceived disabilities.

134. The discrimination that Ms. Morrow experienced was due to Defendant's perception of her as disabled.

135. Defendant did not undertake prompt and effective efforts sufficient to stop the hostile environment detailed herein.

136. As a direct and proximate result of Defendant's unlawful discrimination, Ms. Morrow has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to professional reputation, and other pecuniary and non-pecuniary losses.


**COUNT 6**
**AMERICANS WITH DISABILITIES ACT, AS AMENDED**
**42 U.S.C. § 12101,** *et seq.*
**Constructive Termination Because of Disability**

137. Plaintiff realleges all previous paragraphs as if fully set forth herein.

138. The hostile work environment created, perpetuated, ratified and condoned by Defendant towards Ms. Morrow occurred because of Ms. Morrow's perceived disability.

139. She would not have been the object of harassment but for her perceived disability, and/or her harassment was motivated by her perceived disability.

140. The hostile work environment created, perpetuated, ratified and condoned by Defendant towards Ms. Morrow created conditions so intolerable to any reasonable person that she was constructively discharged.

141. Defendant constructively discharged Ms. Morrow because of her perceived disability.

19

142. As a direct and proximate result of Defendant's unlawful termination, Ms. Morrow has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to professional reputation, and other pecuniary and non-pecuniary losses.

143. By engaging in the conduct described above, Defendant intentionally, knowingly or recklessly with regard to Ms. Morrow's federally protected rights constructively discharged Ms. Morrow, for which Plaintiff seeks punitive damages.

**COUNT 7**
**AMERICANS WITH DISABILITIES ACT, AS AMENDED**
**42 U.S.C. § 12101 *et. seq.***
**Retaliation – Complaints of Disability Discrimination**

144. Plaintiff realleges all previous paragraphs as if fully set forth herein.

145. The effect of Defendant's acts complained of above was to deprive Ms. Morrow of equal employment opportunities as an employee because of retaliation for her complaints of discrimination in violation of the Americans With Disabilities Act.

146. By complaining to Defendant about the discriminatory practices and hostile work environment described herein and opposing said practices and hostile work environment directed at herself, Ms. Morrow engaged in activities protected by the Americans With Disabilities Act.

147. Ms. Morrow's exercise of protected rights was known to Defendant, because the complaints were made to Defendant during her employment.

148. The action taken against Ms. Morrow would dissuade a reasonable employee from making or supporting a complaint of discrimination.

149. As a direct and proximate result of Defendant's unlawful retaliation, Ms. Morrow has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to professional reputation, and other pecuniary and non-pecuniary losses.

150. By engaging in the conduct described above, Defendant retaliated against Ms. Morrow intentionally, knowingly or recklessly with regard to Ms. Morrow's federally protected rights, for which Claimant seeks punitive damages.

## COUNT 8
## SEX AND GENDER IDENTITY DISCRIMINATION
## THE IOWA CIVIL RIGHTS ACT, IOWA CODE CHAPTER 216
### Discrimination Because of Sex and/or Gender Identity

151. Plaintiff realleges all previous paragraphs as if full set forth herein.

152. Defendant is a "person" under the ICRA § 216.6(l)(a).

153. Iowa Code § 216.6(1)(a) provides that:

> It shall be an unfair or discriminatory practice for any … [p]erson to … discharge any employee, or to otherwise discriminate in employment against any applicant for employment or any employee because of the … sex, sexual orientation, gender identity … of such … employee [.]

Iowa Code § 216.6.

154. Plaintiff is a member of a protected class in that she is a woman and in that she is transgender.

155. Defendant violated the ICRA by discriminating against her in the terms and conditions of her employment because of her sex and gender identity.

156. Defendant discriminated against Plaintiff in violation of the ICRA by prohibiting Plaintiff from using single-sex restroom and locker room facilities consistent with her gender identity.

157. Defendant violated the ICRA by constructively discharging Plaintiff because of her sex and/or gender identity.

158. As a proximate cause of Defendant's illegal actions, Plaintiff has been damaged.


## COUNT 9
## IOWA CIVIL RIGHTS ACT, IOWA CODE CHAPTER 216
### Retaliation

159. Plaintiff realleges all previous paragraphs as if full set forth herein.

160. Plaintiff repeatedly complained to Defendant about the discrimination and hostile work environment she was suffering based on her sex and/or gender identity.

161. By complaining to Defendant about the discriminatory practices and hostile work environment described herein and opposing said practices and hostile work environment directed at herself, Ms. Morrow engaged in activities protected by the ICRA.

162. Ms. Morrow's exercise of protected rights was known to Defendant because the complaints were made to Defendant during her employment.

163. The action taken against Ms. Morrow up to and including her constructive discharge would dissuade a reasonable employee from making or supporting a complaint of discrimination.

164. As a direct and proximate result of Defendant's unlawful retaliation, Ms. Morrow has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to professional reputation, and other pecuniary and non-pecuniary losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ms. Tony Morrow respectfully requests that this Court:

169. Declare that the acts, practices, and omissions complained of herein are unlawful and violate Title VII, the ADA and the ICRA;

170. Permanently enjoin Defendant, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them from engaging in the unlawful conduct of discriminating against employees based on sex and/or gender, including transgender employees;

171. Order Defendant to institute and carry out policies, practices, programs, and training which provide equal employment opportunities for employees based on sex and/or gender, including transgender employees, and which eradicate the effects of Defendant's past and present unlawful employment practices;

172. Order Defendant to institute and carry out policies expressly permitting transgender employees to use single-sex facilities such as restrooms and locker rooms consistent with their gender identity;

173. Order other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices;

174. Direct Defendant to pay Ms. Morrow for past and future pecuniary losses resulting from the unlawful practices complained of in the foregoing paragraphs;

175.  Direct Defendant to pay Ms. Morrow for past and future non-pecuniary losses resulting from the unlawful practices complained of in the foregoing paragraphs, including humiliation, loss of enjoyment of life, damage to her profession reputation, and other non-pecuniary losses in an amount to be determined at trial;

176.  Direct Defendant to pay Ms. Morrow punitive and special damages for its malicious or reckless conduct described in the foregoing paragraphs, in an amount to be determined at trial;

177.  Award Ms. Morrow attorneys' fees, costs and disbursements as provided by law; and

178.  Award such additional relief as justice may require.

**Plaintiff demands a trial by jury on all claims.**

Dated: May 19, 2020

Respectfully submitted,

 /s/ Melissa C. Hasso
Melissa C. Hasso    AT0009833
SHERINIAN & HASSO LAW FIRM
111 E. Grand Ave., Suite 212
Des Moines, IA 50309
Tel: (515) 224-2079
Fax: (515) 224-2079
E-mail: melissah_sherinianlaw@msn.com
*Attorneys for Plaintiff Ms. Tony Morrow*

24